NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 170817-U

NO. 4-17-0817

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DWAYNE T. CROOM, | ) | No. 05CF1023 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's sentence is vacated and he is entitled to a new sentencing hearing where the trial court imposed a *de facto* life sentence without first determining, in light of defendant's youth and its attendant characteristics, that defendant was beyond rehabilitation.

¶ 2    In 2006, defendant, Dwayne T. Croom, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2004)) and sentenced to 50 years in prison. In 2017, he filed a *pro se* motion for leave to file a successive postconviction petition based on the claim that his sentence was unconstitutional pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), forbidding mandatory life sentences for juvenile offenders. The trial court denied defendant's motion and he appeals. We vacate defendant's sentence and remand to the trial court for resentencing.

¶ 3                         I. BACKGROUND

¶ 4        In May 2005, the State charged defendant with first degree murder (720 ILCS 5/9-1(a)(2)(West 2004)), alleging he struck three-year-old Altravius Boldon in the abdomen, causing his death. The murder was alleged to have occurred in June 2004, when defendant was 16 years old.

¶ 5        In September 2006, defendant's jury trial was conducted. The State presented evidence that in June 2004, defendant resided with his girlfriend, 21-year-old Rochelle Bolden, and her two young children, three-year-old Altravius and two-year-old Amya. Shortly after 11 p.m. on June 26, 2004, Rochelle called 9-1-1 and reported that Altravius was not breathing. Paramedics arrived at the scene within minutes of the call and observed that Altravius was very cold to the touch and lacked vital signs. Altravius was transported to the hospital and defendant was interviewed by police officer Anthony Lack. Defendant reported he woke up at 11 p.m. because Altravius had urinated on himself in bed. He put Altravius in the bathtub to wash him in cold water but Altravius experienced a seizure, which caused him to fall and hit his head in the tub. Defendant told Lack that Altravius had a history of seizures associated with sickle cell anemia.

¶ 6        Altravius arrived at the hospital at 11:23 p.m. He could not be revived and was pronounced dead the same night. The State presented medical evidence showing Altravius died from blunt force trauma to the abdomen, his body temperature upon arrival at the hospital indicated his death occurred hours before Rochelle's 9-1-1 call, and he had suffered physical abuse.

¶ 7        Dr. Benjamin Welch treated Altravius at the hospital. He opined that Altravius died from blunt force trauma to the abdomen due to child abuse. Dr. Welch based his opinion on (1) bruising on various locations of Altravius's body, including his abdomen, upper left groin, chest, buttocks, and back; (2) the presence of blood in Altravius's abdomen; and (3) a statement

- 2 -

from Rochelle in the emergency room that defendant sometimes hit Altravius. Dr. Welch determined the bruising on Altravius's abdomen was caused by a hard object, knee, or closed fist. He opined that a fall from playground equipment could not have caused the injury that led to Altravius's death and stated seizures were not associated with the condition of sickle cell anemia. Further, according to Dr. Welch, Altravius had an internal body temperature of 88 degrees when he arrived at the hospital. Based on that temperature, he believed hours passed between Altravius's death and Rochelle's call to 9-1-1.

¶ 8        Dr. Bryan Mitchell performed Altravius's autopsy and agreed that Altravius died as a result of blunt force trauma to the abdomen. He testified that blows to the left and right sides of Altravius's abdomen lacerated the omentum and liver, causing internal bleeding. Dr. Mitchell found bruising to both the left and right abdomen indicating multiple blows. He further identified bruises and injuries to other parts of Altravius's body, including bruising on his chest; an abrasion on his lower back; an abrasion on his left hip and bruising to both hips; healing lacerations on his buttocks; an L-shaped abrasion on his left leg; a bruise on the right side of his mouth; a circular scar on his forearm; a bruise on the back of his head that was visible upon internal examination; and a swollen right arm. Dr. Mitchell opined that Altravius's injuries indicated he had been subjected to a pattern of child abuse over time. He also opined that, given Altravius's body temperature of 88 degrees, Altravius died a few hours before 11 p.m.

¶ 9        The State's evidence further indicated that Rochelle had an intellectual disability. Rochelle's grandmother, Jannie Kelly, testified that Rochelle received supplemental security income (SSI) benefits because of low mental functioning. Kimberly Kelly, Rochelle's sister, testified similarly to Jannie regarding Rochelle's mental functioning. She asserted Rochelle had the

intelligence of a 9- or 10-year-old child and would follow instructions from other people.

¶ 10        Jannie further testified that Rochelle lived with her until November 2003, when Rochelle asked to move to her own apartment. While Rochelle lived with Jannie, Jannie was the payee for Rochelle's SSI benefits. After Rochelle moved out and started dating defendant, Jannie noticed bruises on both Altravius and Rochelle. In March 2004, Jannie received a letter informing her that she was no longer the payee for Rochelle's SSI benefits and that the new payee was Dezette Croom, who Jannie eventually learned was defendant's mother. Jannie also testified that after Altravius's death, she accused defendant of murdering Altravius. According to Jannie, defendant responded by saying "what are you going to do about it."

¶ 11        Rochelle testified and acknowledged receiving SSI benefits. She did not know why she received benefits but had been "on disability" since she was a little girl. In late 2003, after moving out of her grandmother's apartment, Rochelle met defendant. She testified defendant told her he was 18 years old. The two began a relationship and defendant moved into Rochelle's apartment. In March 2004, defendant and Rochelle moved from Kankakee to Champaign but did not inform Rochelle's family of the move. Rochelle testified she wanted to call her family but defendant "wouldn't let [her] get to the phone." Also, according to Rochelle, Dezette "took [her] down to the Social Security office to have [her SSI] check changed." She testified "[t]hey told me that I can get my own checks, and be my own payee." Rochelle asserted she helped with the paperwork to change Dezette to her payee but denied that the change was her idea.

¶ 12        Rochelle also testified that defendant physically abused both her and her children. In 2004, Rochelle tried to potty train Altravius. She stated defendant would beat Altravius with his hand or a belt whenever Altravius had an accident and urinated in his pants. Rochelle testified that

on the night of Altravius's death, she woke up around 11 p.m. when defendant called to her from the bathroom. Defendant had Altravius in the bathtub and Altravius was not breathing.

¶ 13        At trial, Rochelle denied hitting Altravius; however, she acknowledged being interviewed by Champaign police detective Robert Rea the day after Altravius's death and reporting that she beat Altravius. According to Rochelle, defendant and Dezette forced her to go to the police station and lie to Rea. Rochelle also testified regarding a third interview with Rea, during which she recanted her statement about beating Altravius.

¶ 14        Rea testified he investigated Altravius's death and interviewed both defendant and Rochelle. He first interviewed Rochelle on the night Altravius died. During that interview, Rochelle denied beating Altravius but admitted that she occasionally spanked him with her hand on his buttocks. The following day, Rochelle called Rea to schedule another interview. Defendant and his mother accompanied Rochelle to the police station and waited for her in the lobby. During that second interview, Rochelle stated she disciplined Altravius with a belt and her hand but could not describe how she struck Altravius with any specificity. She also reported that she struck Altravius twice on the day of his death because he urinated in bed, once in the morning and once around 11 p.m. Rochelle stated that in the morning, she whipped Altravius three times on his buttocks with a belt. At 11 p.m., she whipped him three times with a belt and reported that he was crying during the whipping. Rochelle also admitted to Rea that she was speaking to him because defendant and his mother told her to tell the truth. Rea testified that, during the interview, Rochelle did not "appear to be mentally developed as a normal 21[-]year[-]old," in that her conversation was slow and she had difficulty staying on topic.

¶ 15        Evidence showed Rea also interviewed defendant on the night Altravius died.

During that interview, defendant reported that only Rochelle hit Altravius and that she used her hand and, occasionally, a belt. Defendant denied ever hitting Altravius or that Rochelle beat Altravius on the morning of his death. He asserted that he woke up around 11 p.m. on the night Altravius died and that Rochelle was beating Altravius because he wet the bed. Defendant got up to wash Altravius and while defendant was bathing him, Altravius had a seizure and stopped breathing.

¶ 16 In July 2004, Rea interviewed defendant again. The interview occurred in a police van near defendant's apartment and Rea confronted defendant with medical evidence that contradicted his version of events. According to Rea, during the interview, defendant stated "I can't do this[.] I did this[.]" He then stated he wanted to talk to his mom and go home. Defendant also told Rea that Altravius fell from playground equipment on the day of his death. Defendant then agreed to a recorded interview at the police station. During that interview, defendant denied admitting that he murdered Altravius. He also denied ever beating Altravius. Instead, he asserted that Altravius had been sluggish during the day on June 26 and that he became worse after falling off playground equipment at the park. That night, at 11 p.m., defendant woke up and checked on the children. Altravius had urinated on himself and defendant carried Altravius to the bathroom for a bath.

¶ 17 At trial, defendant testified on his own behalf. He denied telling Rea that he killed Altravius. He asserted Rea misheard him and that only Rochelle hit Altravius. Defendant admitted that he did lie about Altravius falling off playground equipment during his July 2004 interview with the police. According to defendant, on June 26, he woke around 11 p.m. because Rochelle was beating Altravius. After the beating, defendant took Altravius to the bathroom and put him in the bathtub where Altravius had a seizure and fell. Defendant then asked Rochelle to call 9-1-1.

¶ 18 Defendant's mother and sister also testified. Both believed that Rochelle was of normal intelligence. Both also stated they never observed defendant physically discipline Altravius.

¶ 19 Ultimately, the jury found defendant guilty of first degree murder. In October 2006, defendant's sentencing hearing was conducted. The trial court noted it had received victim impact statements and defendant's presentence investigation (PSI) report. The PSI report showed defendant had previous delinquency adjudications in two counties. The first adjudication occurred in January 2004 in Iroquois County and involved charges of unlawful possession of alcohol and retail theft. Defendant received a sentence of one-year of probation. The second adjudication occurred in March 2004 in Kankakee County and involved a charge of retail theft. Again, defendant received a sentence of probation.

¶ 20 Regarding defendant's family history, the PSI report showed defendant reported having a good relationship with his mother, Dezette. His father was imprisoned in the Illinois Department of Corrections (DOC), serving a 20-year prison term for burglary and a 5-year prison term for attempted burglary. Defendant reported that he did have contact with his father. Additionally, although defendant denied that his family was ever involved with the Illinois Department of Children and Family Services (DCFS), records showed that in May 1994, defendant's parents were found unfit or unable to take care of him and his siblings. The children were made wards of the court and placed in the custody of DCFS. In October 1995, Dezette was found fit and defendant and his siblings were returned to her care.

¶ 21 The PSI report further showed that defendant had completed tenth grade in school but dropped out in the eleventh grade because he " 'got bored.' " Before being taken into custody

for the underlying offense, he was enrolled at Parkland College in an effort to obtain his general equivalency degree (GED). Defendant's only employment had been at a McDonald's restaurant the summer before his tenth grade year in high school.

¶ 22        Defendant asserted he had " 'excellent' " mental health. However, the PSI report noted he failed to recount that he had been found unfit to stand trial in September 2005 and diagnosed with antisocial personality disorder. The evaluating doctor wanted " 'to know if [defendant's] problem [was] primarily immaturity and a character disorder, or does [defendant] suffer from an underlying psychosis that needs to be treated.' " Following the finding of unfitness, defendant was placed in a mental health center for over 90 days. In March 2006, defendant was restored to fitness.

¶ 23        The PSI report next showed that defendant denied ever consuming alcohol or using or experimenting with illegal drugs. Again, however, his records indicated otherwise. In particular, defendant had previously been charged with unlawful possession of alcohol by a minor and reported "first consuming alcohol at the age of 12." Additionally, juvenile probation records showed he had been required to submit random urinalysis samples, which tested positive for cannabis in May 2004 and September 2004. Also, defendant was arrested for possession of cannabis with intent to deliver in November 2004, but never formally charged.

¶ 24        At the sentencing hearing, the State presented evidence in aggravation through the testimony of three police officers. According to the officers' testimony, in April 2004, less than two months prior to Altravius's death, police officers from the Kankakee Sheriff's Department executed a search warrant on an apartment in Kankakee based on information regarding the presence of narcotics in the apartment. Rochelle was present in the apartment at the time of the search

with her two young children and reported that her boyfriend kept guns and drugs in the bathroom. She directed the police officers to the location where those items were kept, and the police found "a large baggy that contained 15 individual baggies of crack cocaine, along with two semiautomatic handguns," one of which was loaded. Rochelle was "asked for proof of residence as to who lived in the house." She provided a bill addressed to her and "a letter from the 21st Circuit Courts" addressed to defendant. Additionally, Rochelle reported that the drugs found in the apartment were "brought from a subject named Ray-Ray." She stated that when Ray-Ray was not at the apartment, defendant sold the drugs for Ray-Ray.

¶ 25    The police officers' testimony also showed that in November 2004, several months after Altravius's death, the police were investigating a stolen vehicle and found a phone number they suspected was associated with the sale of narcotics. Officers called the number and set up a meeting with the individual who answered. A male that the officers identified as defendant approached them at the location of the agreed-upon meeting. Ultimately, defendant was searched and found in possession of suspected cannabis, a small amount of money, and a cell phone with a call history that showed the phone number of the officer who set up the meeting. Defendant reported to the police "that he purchased approximately a quarter ounce of cannabis every two or three weeks" and sold it in small amounts "mostly to friends."

¶ 26    The record reflects defendant offered no evidence in mitigation. The State then asked the trial court to impose a sentence near the statutory maximum of 60 years in prison. It argued that there were no statutory factors in mitigation and that the statutory factors in aggravation included that defendant's conduct caused serious harm and that he had a history of prior delinquency and criminal activity. The State described defendant as a 16-year-old who was living as an

adult, not in school, selling drugs, and "living off of" and "taking advantage of a mentally disabled young woman with two children." It further argued that the evidence in the case had shown Altravius suffered abuse "not just on that one day" and that the abuse had been repeated and was "going on for a long time." The State asserted defendant had shown "absolutely no remorse" and that the only possible mitigation was defendant's age at the time of the offense. However, it maintained that although defendant was chronologically 16 years old, "his actions and his behavior clearly indicated that he was far beyond a typical [16-year-old]." The State argued defendant had "shown such a propensity for violence, and for criminality" that he posed a danger to society.

¶ 27        Defendant's counsel asked the court to impose "a minimum sentence." He noted that defendant maintained his innocence and that his age at the time of the offense was "an overwhelming factor in mitigation." Counsel also referenced the "obligation on the part of Rochelle," in that she was an adult and having "a relationship with a [16]-year-old." Defendant offered a statement in allocution, giving his condolences "to the family" but asserting his innocence of the crime.

¶ 28        As indicated, the trial court imposed a 50-year sentence of imprisonment. It stated it had considered the PSI report, the comments of counsel, defendant's statement, the evidence in aggravation, as well as the statutory factors in aggravation and mitigation. It commented on the "tragic situation" presented by the case and the "loss of two lives"—those of Altravius and defendant. The court described defendant as intelligent and articulate and stated "he has a lot of potential." It next noted that the statutory aggravating factors in the case included that defendant had a history of prior delinquency or criminal activity and "the deterrent factor," which it found "far outweigh[ed] the defendant's prior record of criminal activity."

¶ 29    The trial court further stated that no statutory mitigating factors applied but that it could not "overlook the fact that [defendant] was only 16 when this offense was committed." It found defendant's age was "some form of mitigation." The court further stated as follows:

"Although as [the State] has indicated, for someone who was 16, [defendant] was sophisticated enough and, as I've indicated, intelligent enough, articulate enough, to establish a residence outside of Kankakee, to gain access to [Rochelle's] SSI check, and to begin to set up whatever business he was going to set up here in Champaign. But nonetheless, the fact that he's 16 years of age when this offense was committed, is a factor in mitigation.

I can't think of any other mitigating factors that apply to this defendant, to this type of an offense, and as I've indicated, the court has to send a message loudly and clearly that this type of conduct isn't going to be tolerated. And for those individuals who contemplate injuring a child, contemplate doing this type of damage to a child, contemplate killing of a child, they have to understand that they will be punished harshly for that.

So[,] given everything that's been presented, I believe an appropriate sentence is one of incarceration to [DOC]. It will be for a period of 50 years."

¶ 30    Following his conviction and sentence, defendant's case came before this court on three separate occasions. Initially, defendant filed a direct appeal, arguing the trial court erred in denying his motion to suppress statements he made to law-enforcement officers. *People v. Croom*, 379 Ill. App. 3d 341, 342, 883 N.E.2d 681, 682 (2008). In February 2008, we affirmed defendant's conviction and sentence. *Id.* at 352.

- 11 -

¶ 31　　　　Next, in November 2008, defendant filed a *pro se* petition for postconviction relief. He argued his appellate counsel was ineffective for failing to raise several issues on direct appeal, including a challenge to the sufficiency of the State's evidence against him. The trial court summarily dismissed defendant's petition on the basis that it was frivolous and patently without merit. In February 2010, we affirmed the trial court's dismissal. *People v. Croom*, No. 4-09-0047 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 32　　　　Finally, in October 2010, defendant filed a *pro se* motion for leave to file a successive postconviction petition, alleging his trial counsel was ineffective for failing to file a motion to reconsider the trial court's denial of his motion to suppress after he was found unfit to stand trial. The same month, the trial court denied defendant's motion for leave. On review, we rejected a constitutional challenge defendant raised to the automatic transfer provisions of the Illinois Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2004)) and affirmed the court's denial of his motion for leave to file a successive postconviction petition. *People v. Croom*, 2012 IL App (4th) 100932, ¶ 31, 975 N.E.2d 1107.

¶ 33　　　　In September 2017, defendant filed a second *pro se* motion for leave to file a successive postconviction petition, which is the subject of this fourth appeal. He alleged that, pursuant to the United States Supreme Court's decision in *Miller*, 567 U.S. 460, and its progeny, his 50-year prison sentence was a *de facto* life sentence and unconstitutional given that he was a juvenile at the time of the offense and the trial court failed to consider his youth and its attendant characteristics when imposing his sentence. Defendant maintained he was prevented from raising his claim earlier because it is based on case authority that was not available at the time of any earlier proceeding in his case. He asserted prejudice because the recent case authority set forth a new

substantive rule that "retroactively applie[d] to [his] sentencing hearing." Along with his motion, defendant filed a successive postconviction petition. He also attached his PSI report and transcripts from his sentencing hearing to his filing.

¶ 34 On September 28, 2017, the trial court denied defendant's motion for leave to file a successive postconviction petition. It stated that Illinois courts "have not ruled on what the cut-off is for a sentence to be considered a life sentence" and, in the court's opinion, defendant's 50-year prison sentence did "not equate with a life sentence."

¶ 35 This appeal followed.

¶ 36 II. ANALYSIS

¶ 37 On appeal, defendant argues his 50-year prison sentence was a *de facto* life sentence and improperly imposed under *Miller* and its progeny. He contends he should be granted a new sentencing hearing or, alternatively, leave to file his successive postconviction petition.

¶ 38 A. The Post-Conviction Hearing Act

¶ 39 "The Post-Conviction Hearing Act [(Act)] is a legislative creation that permits incarcerated defendants to collaterally attack their conviction by asserting that they suffered a substantial violation of their constitutional rights at trial." *People v. Bailey*, 2017 IL 121450, ¶ 17, 102 N.E.3d 114 (citing 725 ILCS 5/122-1(a) (West 2014)). Generally, "[t]he Act contemplates the filing of only one postconviction petition and provides *** that '[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.' " *Id.* ¶ 15 (quoting 725 ILCS 5/122-3 (West 2014)). However, the trial court may grant a defendant leave to file a successive postconviction petition if the defendant can demonstrate cause for failing to previously raise a constitutional issue and resulting prejudice. *Id.* Specifically, section 122-1(f) of the

- 13 -

Act provides as follows:

> "Only one petition may be filed *** without leave of the court. Leave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure. For purposes of this subsection (f): (1) a prisoner shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings; and (2) a prisoner shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." 725 ILCS 5/122-1(f) (West 2016).

¶ 40    "[A] defendant's *pro se* motion for leave to file a successive postconviction petition will meet the section 122-1(f) cause and prejudice requirement if the motion adequately alleges facts demonstrating cause and prejudice." *People v. Smith*, 2014 IL 115946, ¶ 34, 21 N.E.3d 1172. "In other words, the [trial] court must determine whether defendant has made a *prima facie* showing of cause and prejudice." *Bailey*, 2017 IL 121450, ¶ 24. A court should deny a defendant leave to file a successive petition "when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. "The denial of a defendant's motion for leave to file a successive postconviction petition is reviewed *de novo*." *Bailey*, 2017 IL 121450, ¶ 13.

¶ 41                          B. *Miller* and Its Progeny

¶ 42    As indicated, defendant challenges his sentence based on *Miller* and the line of

cases following that decision. In June 2012, the Supreme Court decided *Miller*, 567 U.S. at 479,

holding "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison

without possibility of parole for juvenile offenders." It relied on prior cases—*Roper v. Simmons*,

543 U.S. 551 (2005), and *Graham v. Florida*, 560 U.S. 48 (2010)—establishing that children are

constitutionally different from adults for sentencing purposes and recognizing three important dif-

ferences between children and adults. *Id.* at 471. Specifically, the court noted that (1) juveniles are

less mature than adults and have an underdeveloped sense of responsibility; (2) juveniles are more

vulnerable to negative influences and outside pressures, including those from family and peers;

and (3) a juvenile's character is not as well formed as an adult's such that the juvenile's actions

are less likely to be evidence of irretrievable depravity. *Id.* (citing *Roper*, 543 U.S. at 570). In

reaching its ultimate holding, the *Miller* court stated as follows:

> "Mandatory life without parole for a juvenile precludes consideration of his chron-
>
> ological age and its hallmark features—among them, immaturity, impetuosity, and
>
> failure to appreciate risks and consequences. It prevents taking into account the
>
> family and home environment that surrounds him—and from which he cannot usu-
>
> ally extricate himself—no matter how brutal or dysfunctional. It neglects the cir-
>
> cumstances of the homicide offense, including the extent of his participation in the
>
> conduct and the way familial and peer pressures may have affected him. Indeed, it
>
> ignores that he might have been charged and convicted of a lesser offense if not for
>
> incompetencies associated with youth—for example, his inability to deal with po-
>
> lice officers or prosecutors (including on a plea agreement) or his incapacity to
>
> assist his own attorneys. [Citations.] And finally, this mandatory punishment

- 15 -

disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

¶ 43　　　　In *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016), the Supreme Court held that *Miller* set forth a new substantive rule of constitutional law and applied retroactively. See also *People v. Davis*, 2014 IL 115595, ¶ 39, 6 N.E.3d 709 ("Since *Miller* declares a new substantive rule, it applies retroactively ***."). Further, the Court explained its holding in *Miller* as requiring "that before sentencing a juvenile to life without parole, the sentencing judge take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ____, 136 S. Ct. at 733. It also stated as follows:

　　　　"The Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of children's diminished culpability and heightened capacity for change, *Miller* made clear that appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." (Internal quotation marks omitted.) *Id.* at___, 136 S. Ct. at 733-34.

¶ 44　　　　Following *Miller*, our supreme court determined its holding and rationale applied not only to juvenile defendants who received mandatory life sentences without the possibility of parole but also to juvenile defendants sentenced "to a mandatory term of years that is the functional equivalent of life without the possibility of parole," *i.e.*, a *de facto* mandatory life sentence, (*People v. Reyes*, 2016 IL 119271, ¶ 9, 63 N.E.3d 884) and "to discretionary sentences of life without parole" (*People v. Holman*, 2017 IL 120655, ¶ 40, 91 N.E.3d 849). More recently, the court has

- 16 -

defined a *de facto* life sentence for a juvenile offender as one that is greater than 40 years. *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42 (stating "a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment" and that because the "defendant's sentence was greater than 40 years," he received a *de facto* life sentence).

¶ 45       Ultimately, to establish a claim based on *Miller* and its progeny, a juvenile defendant "must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Id.* ¶ 27. Further, in *Holman*, 2017 IL 120655, ¶¶ 40-44, the supreme court considered "what it means to apply *Miller*" and determined "that a trial court must consider some variant of the *Miller* factors before imposing a life sentence without the possibility of parole." The court stated as follows:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any

- 17 -

evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. [Citation.]

*** In revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id.* ¶¶ 46-47.

¶ 46        In *Holman*, the supreme court further noted that "consideration of the *Miller* factors" was consistent with section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2016)), which was enacted after *Miller* and requires a sentencing court to consider "additional factors in mitigation" specified in that section prior to sentencing a juvenile offender. *Id.* ¶ 45. Those factors include the following:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social

- 18 -

background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (a) (West 2016).

¶ 47 C. Defendant's *Miller*-based claim

¶ 48 Here, defendant initially asserts he has demonstrated "cause" under section 122-1(f) of the Act for failing to previously raise a *Miller*-based challenge to his sentence. He notes that *Miller* and the relevant cases that followed were not decided until after the conclusion of the earlier proceedings in his case. The State concedes that defendant has established cause and we agree.

¶ 49 The Supreme Court decided *Miller* in June 2012. In the present case, defendant was sentenced in October 2006 and his direct appeal was decided in February 2008. Additionally,

- 19 -

proceedings on his original postconviction petition and his first motion for leave to file a successive postconviction petition concluded in February 2010 and May 2012, respectively. Accordingly, *Miller* and its progeny were unavailable to defendant at the time of his sentencing, direct appeal, and earlier postconviction proceedings. See *Davis*, 2014 IL 115595, ¶ 42 ("In terms of the requisite cause and prejudice of the *** Act, *Miller*'s new substantive rule constitutes 'cause' because it was not available earlier to counsel.").

¶ 50        Defendant further argues that he can demonstrate prejudice because *Miller* and its progeny apply retroactively and govern the sentence imposed in his case—a discretionary, *de facto* life sentence. Moreover, defendant contends that the record shows the trial court failed to consider the *Miller* factors when imposing his sentence or determine that a life sentence was warranted based on a finding of "permanent incorrigibility."

¶ 51        Here, the record reflects defendant was 16 years old at the time of the offense. Further, under *Buffer*, defendant's 50-year prison sentence was a *de facto* life sentence. As a result, we agree with defendant's assertion that the requirements set forth in *Miller* and its progeny apply to his case. The remaining inquiry, then, is whether the record in this case reflects the trial court's compliance with those requirements.

¶ 52        As stated, when deciding whether the trial court satisfied the *Miller* requirements, a reviewing court looks to the cold record of the defendant's original sentencing hearing to determine whether the sentencing court "consider[ed] some variant of the *Miller* factors before imposing a life sentence without the possibility of parole." *Holman*, 2017 IL 120655, ¶¶ 43-44, 47. The trial court may only impose a life sentence without the possibility of parole on a juvenile offender "if the trial court determines that the defendant's conduct showed irretrievable depravity,

- 20 -

permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.*

¶ 46. Additionally, as stated, "[t]he court may make that decision only after considering the defendant's youth and its attendant characteristics," including the following:

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*

Ultimately, a juvenile offender facing a life sentence must be given the opportunity to show that his criminal conduct was the product of immaturity and that it does not reflect irreparable corruption or incorrigibility. *Id.* ¶ 49 (citing *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736).

¶ 53    Defendant argues that, in his case, the trial court failed to consider his youth; evidence of his immaturity, impetuosity, or a failure to appreciate risks and consequences; his neglectful family and home environment; and his prospects for rehabilitation. He also argues that the court never determined him to be permanently incorrigible.

¶ 54    First, regarding the trial court's consideration of the *Miller* factors, we note the record reflects defendant was given the opportunity to present evidence that his criminal conduct was the product of immaturity and not irreparable corruption or incorrigibility. He elected not to present any evidence at sentencing. Nevertheless, some information pertinent to the *Miller* factors

was presented and considered by the court through defendant's PSI report, the arguments of the parties, and the court's awareness of the facts of the case.

¶ 55    Specifically, the PSI report showed defendant had been found unfit for a period of time while his case was pending. He was diagnosed with antisocial personality disorder and the evaluating doctor raised a question regarding whether defendant's "problem" was "immaturity and a character disorder *** or an underlying psychosis ***." The PSI report further set forth information regarding defendant's family life, indicating he was removed from his parents' care as a child and that his father was in prison. Nevertheless, defendant asserted that he had a good relationship with his mother and that he maintained contact with his father. Evidence at sentencing described defendant's criminal conduct, both before the commission of the underlying offense and after. The record also reflects that the trial court was well aware of the facts of the case from which it could judge defendant's conduct relative to the underlying offense. Finally, although there was no explicit statement or evidence discussing defendant's rehabilitative potential, the court could evaluate such through its consideration of the other evidence presented, including defendant's criminal history.

¶ 56    Although we find defendant was given the opportunity to show that his criminal conduct was the product of immaturity and that the trial court did consider the evidence presented at the sentencing hearing, we find the record does not show the court made the ultimate and necessary determination, required by the Supreme Court in *Miller* and our supreme court in *Holman*, that defendant was beyond rehabilitation. Initially, the State contends defendant forfeited any claim that his sentence is unconstitutional based on the trial court's failure to make such a finding because it was not raised in connection with defendant's motion for leave to file a successive

- 22 -

postconviction petition. See *People v. Jones*, 213 Ill. 2d 498, 505, 821 N.E.2d 1093, 1097 (2004) (stating a claim not raised during postconviction proceedings before the trial court "cannot be argued for the first time on appeal").

¶ 57　　　　Here, defendant clearly raised a *Miller*-based challenge to his 50-year prison sentence before the trial court. On appeal, he argues that a finding of permanent incorrigibility, *i.e.*, a finding that he was beyond rehabilitation, was required under *Miller* before the court could sentence him to a *de facto* life sentence. While he did not make that explicit assertion in his *pro se* filing, he did raise the essence of such a claim. In particular, as defendant points out in his reply brief, he argued below that the court's sentence "ignore[d] his capacity for change" and "reflect[ed] a determination that the offender should be treated as incapable of rehabilitation and *** beyond redemption." Under these circumstances, we decline to find forfeiture.

¶ 58　　　　On appeal, the State alternatively argues that *Miller* does not require a finding of permanent incorrigibility before the imposition of a life sentence for a juvenile offender. It cites *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736, wherein the Supreme Court thoroughly discussed its decision in *Miller* and held that it announced a new substantive rule of law, which applied retroactively. In so holding, the Court addressed the suggestion "that *Miller* cannot have made a constitutional distinction between children whose crimes reflect transient immaturity and those whose crimes reflect irreparable corruption because *Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility." *Id.* at ___, 136 S.Ct. at 735. It further stated as follows:

　　　　　　　"That this finding is not required, however, speaks only to the degree of procedure *Miller* mandated in order to implement its substantive guarantee. When a new

substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems. [Citation.] Fidelity to this important principle of federalism, however, should not be construed to demean the substantive character of the federal right at issue. That *Miller did not impose a formal factfinding requirement* does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." (Emphasis added.) *Id.*

¶ 59 Ultimately, while *Miller* may not require that a sentencing court follow particular and specific factfinding procedures when considering the imposition of a life sentence on a juvenile offender, it does render "life without parole an unconstitutional penalty for *** juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* at ___, 136 S.Ct. at 734. In other words, *Miller* barred the imposition of a sentence of life without parole "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* As stated in *Montgomery*, "*Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Id.* Additionally, as discussed, in *Holman*, 2017 IL 120655, ¶ 46, our supreme court held that, pursuant to *Miller* and *Montgomery* a juvenile may be sentenced to life without parole "*only* if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." (Emphasis added.) A court makes such a decision only after considering the juvenile defendant's youth and its attendant characteristics. *Id.*

¶ 60    This court's recent decision in *People v. Murphy*, 2019 IL App (4th) 170646, is also instructive. There, the defendant, who was 16 years old at the time of his offense, argued the trial court's finding that he possessed rehabilitative potential foreclosed a *de facto* life sentence. *Id.* ¶ 40. On appeal, we noted that a life sentence for a juvenile offender is constitutional "[o]nly after consideration of youth and its attendant circumstances, as in the *Miller* factors or those in section 5-4.5-105 [of the Code], *and* a finding of irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation[.]" (Emphasis in original.) (Internal quotation marks omitted.) *Id.* ¶ 47. Further, we concluded the defendant's sentence was unconstitutional because the court's finding that the defendant had rehabilitative potential "contravene[d] any conclusion [the] defendant was permanently incorrigible or irretrievably depraved[.]" *Id.* ¶ 48; see also *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 55, 52 N.E.3d 442 (stating the trial court's findings did "not imply that it believed [the] defendant was the *rarest* of juveniles whose crime showed that he was permanently incorrigible" and noting it found the "defendant could change his life" (emphasis in original)); *People v. Harvey*, 2019 IL App (1st) 153581, ¶¶ 12-13 (holding "that the [sentencing] court's mere awareness of a defendant's age and consideration of a PSI does not provide evidence that [it] specifically considered [the] defendant's youth and its attendant characteristics" and noting that "the trial court did not discuss [the] defendant's prospects for rehabilitation").

¶ 61    On review, we agree with the State's contention that the trial court, prior to issuing a *de facto* life sentence, was not procedurally required to make a specific or explicit factual finding that defendant was "permanently incorrigible" in order to satisfy *Miller's* requirements. However, to withstand defendant's *Miller*-based constitutional challenge, the court did have to consider the

- 25 -

*Miller* factors and make a determination that defendant was not among those juvenile offenders whose conduct reflects transient immaturity and that, instead, his conduct reflected that rehabilitation was not possible, *i.e.*, he was among the rarest of juvenile offenders whose "conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 62 As indicated, here, we find the record fails to evidence a determination by the trial court that defendant's conduct was not the result of transient immaturity but, instead, irreparable corruption beyond rehabilitation. As the State points out, the court expressed that defendant was sophisticated, intelligent, and articulate, suggesting it did not find evidence that defendant acted with immaturity or impetuosity. However, despite that description of defendant, the court also stated "he has a lot of potential" and, ultimately, concluded that defendant's age at the time of the offense was a mitigating factor in the case. That latter finding came after the court's description of defendant and was not qualified by any other conflicting finding related to the *Miller* factors. Absent qualification, the record indicates the court viewed defendant's youth as favoring a less harsh sentence. *Cf. People v. Stafford*, 2018 IL App (4th) 140309-B, ¶ 30, 107 N.E.3d 968 (finding no *Miller* violation where the trial court determined the defendant's acts were " 'too senseless and too vicious to give a great deal of weight to his age, particularly given [his] history' " and multiple unsuccessful attempts at rehabilitation).

¶ 63 Further, the trial court's statement that defendant had "a lot of potential" puts this case in a similar category as *Murphy*, 2019 IL App (4th) 170646, ¶ 48, wherein we held the trial court's finding that the defendant had rehabilitative potential "contravene[d] any conclusion [the] defendant was permanently incorrigible or irretrievably depraved[.]" Here, although the court

- 26 -

made no explicit finding or statement that defendant had rehabilitative potential, its comment suggests such a finding, particularly when coupled with its unqualified determination that defendant's youth was a mitigating factor. Accordingly, the court's statements here also contravene a finding of permanent incorrigibility or irretrievable depravity beyond rehabilitation.

¶ 64 Moreover, it is apparent from the trial court's comments that it placed a great deal of weight on the deterrent factor when sentencing defendant to 50 years in prison. The court stated that the deterrent factor was "very important," even more so than defendant's criminal history. After finding that defendant's age was a mitigating consideration, the court concluded it nevertheless had to "send a message loudly and clearly that this type of conduct isn't going to be tolerated" and that individuals who harm or kill a child will be "punished harshly." However, as the Supreme Court has held "[t]he deterrence rationale **** does not suffice" as a justification for imposing a life sentence on a juvenile offender "since the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 733 (citing *Miller*, 567 U.S. at 472).

¶ 65 Given the trial court's comments at sentencing regarding defendant's "potential" and his age at the time of the offense, it is not apparent that it determined his criminal "conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" (*Holman*, 2017 IL 120655, ¶ 46). In fact, the record points toward an opposite determination. Ultimately, without evidence suggesting the trial court determined that defendant was beyond rehabilitation, his *de facto* life sentence does not meet constitutional requirements under *Miller* and its progeny.

¶ 66        On appeal, the State argues that it was enough in this case that information related to the *Miller* factors was presented at sentencing and that the court's comments indicated it considered the evidence presented. It cites cases that it argues present similar circumstances and where the defendants' *Miller* claims were rejected.

¶ 67        First, the State relies heavily on *Holman*, where the supreme court found "[t]he defendant's sentence passe[d] constitutional muster under *Miller*." *Id.* ¶ 50. In so holding, the court noted that the trial court had "explicitly stated that it considered the trial evidence and the PSI [report], as well as the evidence and arguments from the sentencing hearing." *Id.* ¶ 48. The court then highlighted the trial court's awareness of defendant's age at the time of the offense, information contained within his PSI report and attached psychological reports, as well as the evidence presented at the defendant's trial. *Id.* In particular, the court noted that the defendant's PSI report contained information regarding the defendant's family, the defendant's susceptibility to peer pressure, his intelligence, and his prospects for rehabilitation. *Id.* Regarding that last factor the court noted "the PSI [report] included a statement from the probation officer, who found 'no predilection for rehabilitation,' in light of the defendant's 'history of senseless criminal acts of mortal violence toward others and lack of remorse for his victims.' " *Id.* The court's decision also shows that when imposing its sentence, the trial court explicitly stated the defendant "cannot be rehabilitated," and that it was important to protect society from him. *Id.* ¶ 17. It further stated as follows:

> "[T]he trial court had no evidence to consider on any of the statutory factors in mitigation, but some evidence related to the *Miller* factors. On the other side of the scale, the trial court had significant evidence to consider on the statutory factors in aggravation. [Citation.] The defendant admits in his reply brief that 'there are bad

- 28 -

facts.' That is an understatement. The trial court knew those facts, having presided over the case from pretrial motion hearings through the trial and the sentencing hearing. *The court concluded that the defendant's conduct placed him beyond rehabilitation* and sentenced him to life without parole." (Emphasis added.) *Id.* ¶ 50.

¶ 68 We find *Holman* dissimilar from the present case because, there, the trial court's comments clearly showed that it considered the defendant's prospects for rehabilitation and determined that he had none. In fact, the court explicitly stated the defendant "cannot be rehabilitated" when imposing his sentence. Thus, the record communicated a finding by the trial court that the defendant was among those rare juvenile offenders described in *Miller*, whose conduct reflects "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46.

¶ 69 Next, the State also relies on this court's decision in *Stafford*, 2018 IL App (4th) 140309-B. In that case, the defendant was found guilty of murdering a woman, an offense he committed at the age of 17, and was sentenced to natural life in prison. *Id.* ¶¶ 8-9, 30. In imposing that sentence, the trial court noted the defendant's young age but determined his acts were " 'too senseless and too vicious to give a great deal of weight to his age, particularly given [his] history' " and the " 'multiple attempts' " that were previously made " 'to rehabilitate [him] without success.' " *Id.* ¶ 30. On review, we rejected the defendant's *Miller*-based challenge, noting the court sufficiently considered the defendant's youth and its attendant characteristics and that its "reasoning convey[ed] a finding of permanent incorrigibility." *Id.* ¶¶ 61-62.

¶ 70 Again, we find *Stafford* is distinguishable. Here, the record does not "convey" a finding of permanent incorrigibility. The trial court never made any express comments regarding

rehabilitation. In fact, as stated, the court found defendant had "a lot of potential"—a finding that would be contrary to one suggesting permanent incorrigibility or irretrievable depravity. See *Murphy*, 2019 IL App (4th) 170646, ¶ 48. Additionally, where the trial court in *Stafford* found the defendant's youth was not entitled to great weight given the senseless and vicious nature of the crime and the defendant's unsuccessful attempts at rehabilitation, the court in this case found the defendant's age was a mitigating factor but that the need for deterrence ultimately required a harsh penalty.

¶ 71         Additionally, in *People v. Croft*, 2018 IL App (1st) 150043, ¶ 4, 100 N.E.3d 577, the 17-year-old defendant participated in the gang rape, kidnapping, and murder of a 16-year-old girl. In addressing the defendant's *Miller* claim on review, the First District found the sentencing court provided "a clear indication that [it] believed [the] defendant to be incorrigible" where it described the offense as being " 'as heinous a murder as one can imagine' " and the defendant as having " 'evil intentions' " and being " 'absolutely heartless' " and " 'almost inhuman.' " *Id.* ¶ 31. Although in this case the trial court recited pertinent facts of the crime in defendant's case, its comments fell far short of the ones made by the court in *Croft* and they do not similarly reflect "a clear indication" of the court's findings as to defendant's incorrigibility or capacity for rehabilitation.

¶ 72         As stated by the Supreme Court in *Miller* and *Montgomery*, the imposition of a sentence of life without parole is impermissible for all but the rarest of juvenile offenders whose crimes reflect that they are beyond rehabilitation. In this case, we find the trial court imposed a *de facto* life sentence on defendant and the record does not reflect the court determined defendant was among the rarest of juvenile offenders whose "conduct showed irretrievable depravity,

permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Accordingly, we agree with defendant that his *de facto* life sentence did not satisfy the *Miller* requirements.

¶ 73                                    D. Relief

¶ 74        Defendant acknowledges that relief from the erroneous denial of a motion for leave to file a successive postconviction petition generally requires remand for further postconviction proceedings. See *Bailey*, 2017 IL 121450, ¶ 25 ("[S]atisfying the section 122-1(f) cause and prejudice requirement does not entitle the defendant to relief but rather only gives a petitioner an avenue for filing a successive postconviction petition." (Internal quotation marks omitted.)). However, he argues that further postconviction proceedings would be unnecessary in this case because the cold record aptly demonstrates that constitutional error occurred and, as a result, we should remand the matter for a new sentencing hearing rather than the filing of a successive postconviction petition. We agree.

¶ 75        In *Buffer*, 2019 IL 122327, ¶ 7, the defendant, relying on *Miller*, raised a postconviction challenge to his 50-year prison sentence. The trial court summarily dismissed the defendant's petition and he appealed. *Id.* ¶¶ 7-8. On review, the supreme court determined that the defendant's sentence was a *de facto* life sentence and that the trial court failed to consider the defendant's youth and its attendant characteristics when imposing sentence. *Id.* ¶ 42. Further, it noted that the parties disagreed as to the appropriate remedy in the case, with the State arguing that the matter should be remanded for advancement to the second stage of postconviction proceedings and the defendant arguing he was entitled to a new sentencing hearing. *Id.* ¶ 44. The court agreed with defendant, stating as follows:

- 31 -

"[T]he record before us does not require factual development. All of the facts and circumstances to decide defendant's claim are already in the record. [Citation.] While the circuit court stated that it 'considered all of the relevant statutory requirements,' the record does not indicate that the court considered defendant's youth and its attendant characteristics. [Citation.] Accordingly, we earlier held that defendant's 50-year prison sentence, imposed for a crime he committed while a juvenile, violated the eighth amendment. This holding applies retroactively and is cognizable in defendant's postconviction proceeding. [Citation.]

Based on the particular issue raised in this appeal and in the interests of judicial economy, we agree with the appellate court that the proper remedy is to vacate defendant's sentence and to remand for a new sentencing hearing." *Id.* ¶¶ 46-47.

¶ 76  Here, the cold record was sufficient for our review of defendant's *Miller* claim and no factual development was required. Additionally, while some evidence relative to defendant's youth and its attendant characteristics was presented to the trial court, the record fails to convey that the court determined that "defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation" (*Holman*, 2017 IL 120655, ¶ 46) before imposing a *de facto* life sentence. Accordingly, we find the proper remedy is to vacate defendant's sentence and remand for a new sentencing hearing.

¶ 77                         III. CONCLUSION

¶ 78  For the reasons stated, we vacate defendant's sentence and remand for a new sentencing hearing.

¶ 79          Sentence vacated; remanded for resentencing.