NO. 4-06-0927          Filed 2/15/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,  ) Appeal from
            Plaintiff-Appellee,        ) Circuit Court of
            v.                         ) Champaign County
DWAYNE T. CROOM,                       ) No. 05CF1023
            Defendant-Appellant.       )
                                       ) Honorable
                                       ) Thomas J. Difanis,
                                       ) Judge Presiding.
_____

JUSTICE McCULLOUGH delivered the opinion of the court:

A jury found defendant, Dwayne T. Croom, guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2004)) and the trial court sentenced him to 50 years in prison.  Defendant appeals, arguing the court erred by denying his motion to suppress statements he made to law-enforcement officers that he alleges were made during a custodial interrogation and without the benefit of Miranda warnings (see Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)).  We affirm.

The record reflects defendant lived with his girl-friend, Rochelle Bolden, and her two children, three-year-old Altravius and two-year-old Amya.  (Alternate spellings of Altravius's name appear in the record but, for purposes of consistency, the above spelling will be used herein.)  On May 31, 2005, the State charged defendant with the first degree murder of Altravius.  It alleged, on June 26, 2004, he struck Altravius in the abdomen and caused Altravius's death.  On the date of the alleged offense, defendant was 16 years old.

On July 19, 2005, defendant filed a motion to suppress oral statements he made to police officer Robert Rea. Defendant alleged the statements were made during a custodial interrogation but that he was not afforded the opportunity to knowingly waive his constitutional rights to remain silent, to consult a lawyer, to have a lawyer present, or to terminate the interrogation at any time, nor was he told that anything he said could be use against him in court. Defendant also raised questions concerning the voluntariness of his statements.

On July 29, 2005, the trial court conducted a hearing on defendant's motion to suppress. Rea testified he was a detective with the Champaign, Illinois, police department and was assigned to investigate Altravius's death. In connection with that investigation, he interviewed both defendant and Rochelle. Rea's first interview with defendant took place at the police department shortly following Altravius's death.

On July 7, 2004, Rea discussed the case with Dr. Bryan Mitchell, the doctor who performed the autopsy on Altravius's body. Dr. Mitchell stated the cause of Altravius's death was blunt-force trauma to the abdomen. Additionally, Rea learned information that was inconsistent with the version of events defendant provided. During the course of his investigation, Rea further learned defendant had a criminal history that included convictions for retail theft and burglary to a motor vehicle.

On July 21, 2004, Rea attempted to locate defendant. He was accompanied by Sergeant Jim Rein and the two rode in

- 2 -

Rein's work van. The van was unmarked and did not have a cage or police radio. It did have a small, narrow, light bar located in front of the rearview mirror. Rea testified he was dressed in a collared shirt and dress slacks.

The officers located defendant at approximately 3 p.m., exiting an apartment. Rea called to defendant and defendant approached the officers. After conversing about a newspaper article that defendant felt portrayed him in a bad light, Rea asked to speak with defendant about statements Rochelle made to police. In response, defendant entered the van. Rea stated he did not ask defendant to get in the van and defendant was not searched prior to entering. Rea also testified the van was parked in the driveway of an apartment building. Once defendant was in the van, Rein asked defendant if the officers could move the van somewhere else. Defendant agreed and the officers drove the van approximately three blocks away and parked it on the street. Rea testified that he did not lock the van doors after defendant entered the van; however, the doors may have locked automatically as the van was being driven.

Once the van was moved, Rea asked defendant to tell him what happened the night Altravius died. Rea stated defendant repeated essentially the same story he had given during their first interview but added a few more details. Some of the details defendant provided were inconsistent with information obtained from Altravius's autopsy. Rea confronted defendant with the inconsistencies in his story. Defendant maintained that he

- 3 -

was being truthful but became fidgety, nervous, and upset. According to Rea, defendant never asked to leave the van.

Rea testified he continued to converse with defendant and question defendant's story. Defendant became increasingly upset as Rea discounted his version of events. Ultimately, defendant started crying and stated as follows: "I did it. I can't do this. I want to talk to my mom. I want to go home." Rein asked defendant if he wanted to go home, and defendant replied that he did. The officers began driving toward defendant's residence and Rea showed defendant a photograph of Altravius's body prior to the autopsy. The photograph showed bruising and injuries to Altravius's side. Defendant became extremely upset and was yelling and crying.

Upon arriving at defendant's residence, Rea asked if he could ask defendant one more question and defendant replied that Rea could. Rea then inquired as to whether defendant could think of anything that happened on the day Altravius died that could have caused his injuries. Defendant responded that Altravius fell on some playground equipment. Rea asked defendant to show him the playground equipment and defendant said that he would. Defendant did not ask to have his mother accompany them.

Defendant directed the officers to a playground. Along the way, defendant indicated he wanted a cigarette and Rein stopped at a convenience store where a pack of cigarettes and a bottle of water were obtained for defendant. At the playground, defendant directed the officers to a specific piece of playground

equipment and described the incident. The officers and defendant then returned to the van and drove to a convenience store so that Rea could use the restroom. Rea stated he got out of the van at the convenience store. The doors to the van were open and other people were around. At that time, defendant did not state that he wanted to leave.

When Rea returned from the restroom, he heard Rein ask defendant to go to the police department and provide a taped statement. Defendant said that he would provide a taped statement and the officers traveled with defendant to the police department. At the police department the officers took defendant to an interview room and read him the <u>Miranda</u> warnings. Defendant indicated he understood his rights and was willing to speak with the officers.

At the beginning of the interview Rea asked whether he made defendant go to the police department and defendant stated "no." Rea also asked whether he made defendant tell him anything that day and, again, defendant responded "no." Additionally, Rea asked whether everything they talked about and everything defendant told Rea was because defendant wanted to and defendant responded "yes." Rea and defendant then discussed the circumstances of Altravius's death. That portion of the interview was videotaped and audiotaped. Defendant was not arrested after the interview.

Rea testified that he never made any promises to defendant nor did he threaten defendant in any way. Also, he

never told defendant that he could not leave.  Defendant asked to go home once and the officers took him home.  Further, other than that one time, defendant never asked to leave.

On cross-examination, Rea stated he was aware defendant was 16 years old when the interview occurred.  He also knew defendant had been in high school and defendant told Rea that he was getting a GED (general equivalency diploma).  Rea did not know what level of schooling defendant completed or his reading level.  More specifically, he was not aware that defendant was at a seventh-grade reading level.  Rea did, however, know defendant could read and write because he followed along with Rea on the Miranda form during their first interview.  Regarding defendant's comprehension level, Rea was only aware that defendant stated he understood his Miranda rights.

The day Rea interviewed defendant in the van, they were together for 3 1/2 or 4 hours.  He did not read defendant his Miranda rights nor did he call defendant's mother or any adult with an interest in defendant's welfare.  Rea further testified that both he and Rein were juvenile officers and that his goal during the van interview was to get defendant to confess to murder.  Rea denied getting agitated during the interview or swearing.  Further, he testified that, after defendant asked to go home, the officers drove defendant home.  It was defendant's choice not to get out of the vehicle at that point.

On redirect, Rea testified that he felt defendant was more mature than most 16 year olds because of his lifestyle and

that factored into the way the officers spoke with him during the interview. Specifically, they considered that defendant had been living in an adult relationship and caring for children and that his own mother lived an hour and a half away. The manner in which they approached defendant on the day in question was also affected by (1) the fact that defendant had prior police contacts and was on probation and (2) their previous contacts with him and knowledge of his level of understanding. Additionally, during Rea's first interview with defendant, Rea asked defendant if he knew how to read and write and defendant responded that he did.

Regarding the van locks, Rea stated there was nothing special about the van that made it impossible to unlock the van from the inside. There was also nothing obstructing defendant's access to the van door. At no time did defendant attempt to unlock the door, nor was he told that he could not unlock the door. Rea testified, when they stopped at the park, defendant would have had to open the van door and let himself out because Rea could not open the door from the outside when it was locked.

Defendant testified on his own behalf. He stated, on July 21, 2004, at approximately 3:30 p.m. he saw Rea as he was leaving his mother's apartment building. Rea was in a van with another officer and asked defendant to "come over here." Defendant stated he walked over to Rea because he believed he would have been arrested if he failed to listen. Rea asked defendant if he would get in the van but defendant refused. Rea then told defendant to get in the van and defendant complied. Defendant

- 7 -

stated he finally entered the van because Rea was a police officer and defendant thought he would be arrested for failing to comply.  At that time defendant was 16 years old.

After entering the van, defendant felt like he was under arrest.  He stated he was in the backseat of the van and the doors were locked.  Defendant did not feel like he could exit the van at his own discretion.  He thought that if he tried to leave he would be charged with trying to get away.  Further, defendant testified he was not read his Miranda rights.

After he entered the van, defendant and Rea initially talked about newspaper articles that mentioned the case.  Defendant stated he was upset because an article made it sound like he whipped Altravius on the night he died.  Rea responded by telling defendant he was "a fucking liar" and that Rea believed defendant "did it."  Defendant stated Rea called him a liar three or four times.

Defendant stated he was in the van for 2 or 2 1/2 hours.  At first, the van was parked in a driveway and remained there for 10 to 15 minutes.  The officers then stated they wanted to move somewhere else and "take a ride."  Defendant testified they drove the van to a park.  He stated he had no choice in where the van was driven and he was not asked where he wanted to go.  Further, the officers did not tell him he was free to leave or that he could go home at any time.  At one point, the officers stopped the van at a gas station and asked defendant if he wanted water and offered him a pack of cigarettes.  He did not know why

he did not go home when they stopped at the gas station. How-
ever, defendant also stated that the van doors were locked and he
could not have left the van.

While at the park, defendant told the officers that he
wanted to go home and specifically stated that he wanted his
mother. At that point, he had been with the officers for approx-
imately an hour and a half. Defendant testified the officers
ignored his requests and continued to question him. Also, he
reached for the van door but it was locked.

Defendant further testified the officers showed him a
photograph of Altravius's body. Defendant became upset and
stated he wanted to go home and get out of the van. He testified
he reached for the door but it was locked and he started to cry.
Defendant stated that, during their conversation, Rea told him
everything would be okay and nothing would happen to defendant.
However, Rea also stated that he would do everything in his power
to see that defendant rotted in jail. Defendant felt manipulated
into saying something that he otherwise would not have said and
believed Rea confused him. He denied ever stating "I did it."

At some point the officers took defendant to the
driveway of his residence but did not let him out. Instead, Rea
stated he wanted to ask defendant another question. Defendant
reached for the door but it was still locked. Defendant contin-
ued to answer questions because he could not get out of the van.

Defendant additionally testified that he attended an
alternative school and the tenth grade was as far as he went in

- 9 -

school.  He stated that he read at a seventh-grade level. Further, defendant acknowledged previous contacts with law enforcement.

On cross-examination, defendant testified that he was living away from his own mother in Champaign with Rochelle and her children.  Defendant's mother lived in Kankakee, Illinois. He further acknowledged that, following the van interview, he made a taped statement at the police department.  Prior to making his statement, police read him the Miranda warnings.  Defendant acknowledged that he stated he willingly went to the police department and was not forced to go there by Rea.  He also stated he was not forced to make any statements that day and he willingly made statements to Rea.  On redirect, defendant testified he made those statements about his willingness to speak with Rea because he was afraid.

After hearing the evidence and listening to the parties' arguments, the trial court denied defendant's motion to suppress. It found his statements were voluntarily made and that, while in the van, he was not in custody for Miranda purposes. The court emphasized its finding that the van the officers drove was not a police vehicle and was, instead, "the type of modern vehicle that when one puts it in gear and starts driving, it automatically locks the doors."  It noted the evidence failed to indicate the van was the type of vehicle that could secure someone on the inside without that person being able to get out. For further support that the van was not a police vehicle, it

- 10 -

pointed to Rea's testimony that he could not open the van door from the outside when it was locked and that, at the park, defendant most likely opened the van door and exited the vehicle on his own.

The trial court found that defendant entered the van of his own will. Also, it was of the opinion that, after defendant became upset and the officers drove him home, defendant could have exited the van if he wanted; however, upon inquiry by Rea, defendant agreed to answer another question. The court rejected the idea that defendant's will was overborne by the officers or that he was so distraught, confused, or frightened that he did not know what he was doing. It stated "except for that period of time when he got emotional, the rest of the time [defendant] was coming up with answers to questions that were being asked, answers that were not going to incriminate him."

The trial court also considered defendant's age, education, intellectual level, prior experiences, and lifestyle. It stated defendant looked and sounded more mature than a typical 17 year old, his age at the date of the suppression hearing. It commented on defendant's prior experiences with law enforcement, noting he was on probation in a juvenile case. It found defendant was familiar with not only police officers but the court system itself. The court further pointed out that, although defendant was 16 years old at the time of the offense, he was living independently with his girlfriend. It also determined that he could read, noting the evidence showed he read a newspa-

per article about the case and became upset with its contents. Additionally, the court found defendant was "an intelligent young man" and "somewhat articulate."

Following the suppression hearing, defendant's case proceeded to a jury trial. On September 8, 2006, the jury found him guilty of first degree murder. On October 18, 2006, defendant filed a motion for a new trial, alleging, in part, that the trial court erred by denying his motion to suppress. On October 19, 2006, the court denied defendant's posttrial motion. The same date, the court sentenced defendant to 50 years in prison.

This appeal followed.

On appeal, defendant argues the trial court erred by denying his motion to suppress statements he made in the van to Officer Rea. He contends the statements at issue were made during the course of a custodial interrogation and are inadmissible because he was not read his Miranda rights. Defendant does not dispute the voluntariness of his statements.

Mixed questions of law and fact are presented by a challenge to a trial court's ruling on a motion to suppress. People v. Pitman, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 100 (2004). The court's factual findings will be upheld unless they are against the manifest weight of the evidence. Pitman, 211 Ill. 2d at 512, 813 N.E.2d at 100. "This deferential standard of review is grounded in the reality that the [trial] court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts

- 12 -

in their testimony." Pitman, 211 Ill. 2d at 512, 813 N.E.2d at 100-01. "[T]he ultimate question of whether the evidence should be suppressed" is subject to de novo review. Pitman, 211 Ill. 2d at 512, 813 N.E.2d at 101.

In Miranda, 384 U.S. at 444, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612, the Supreme Court held that a suspect's statements are inadmissible when they are made during a custodial interrogation and without the suspect being informed of certain constitutional rights, including the right to remain silent and the right to counsel. A custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. "[I]n determining whether a person is 'in custody' for purposes of Miranda, a court should first ascertain and examine the circumstances surrounding the interrogation, and then ask if, given those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." People v. Braggs, 209 Ill. 2d 492, 506, 810 N.E.2d 472, 481 (2003).

Relevant factors to consider when determining whether an individual was in custody include "(1) the time and place of the confrontation; (2) the number of police officers present; (3) the presence or absence of family or friends; (4) any indicia of a formal arrest procedure, such as physical restraint, the show of weapons or force, booking[,] or fingerprinting; and (5) the

- 13 -

manner by which the individual arrived at the place of the interrogation."  People v. Melock, 149 Ill. 2d 423, 440, 599 N.E.2d 941, 948 (1992).  Regarding the reasonable-person portion of the custody inquiry, "the accepted test is what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes."  Braggs, 209 Ill. 2d at 506, 810 N.E.2d at 482.  Additionally, although a police officer's intent is relevant to determine wither the officer created a coercive atmosphere requiring the Miranda warnings, the focus of the custody inquiry is always on what the defendant thought and believed.  People v. Gorman, 207 Ill. App. 3d 461, 472-73, 565 N.E.2d 1349, 1356 (1991).

Initially, the parties disagree on the extent to which defendant's age should be considered when determining whether he was in custody for purposes of Miranda.  Defendant cites Braggs, 209 Ill. 2d 492, 810 N.E.2d 472, for the proposition that the reasonable-person standard should be modified to take into account the general characteristics of juveniles.  He maintains the proper consideration for a court when making a custody determination is whether a reasonable 16-year-old would have felt at liberty to terminate the interrogation and leave.

The State argues the principle for which defendant cited Braggs is not good law because Alvarado v. Hickman, 316 F.3d 841 (9th cir. 2002), a case our supreme court relied heavily upon in Braggs, was reversed by the United States Supreme Court in Yarborough v. Alvarado, 541 U.S. 652, 655, 158 L. Ed. 2d 938,

946, 124 S. Ct. 2140, 2144 (2004).  In Yarborough, 541 U.S. at 655, 158 L. Ed. 2d at 946, 124 S. Ct. at 2144, the Supreme Court found the Alvarado state court's failure to consider the defendant's age did not provide a proper basis for finding that the court's decision was an unreasonable application of clearly established law.  In reaching that decision, the Supreme Court noted it never stated a suspect's age or experience was relevant to the Miranda custody analysis, finding its "opinions applying the Miranda custody test have not mentioned the suspect's age, much less mandated its consideration."  Yarborough, 541 U.S. at 666, 158 L. Ed. 2d at 952-53, 124 S. Ct. at 2150-51.  Additionally, the Court stated as follows:

> "There is an important conceptual difference between the Miranda custody test and the line of cases from other contexts considering age and experience. The Miranda custody inquiry is an objective test. *** The objective test furthers 'the clarity of [Miranda's] rule,' [citation], ensuring that the police do not need 'to make guesses as to [the circumstances] at issue before deciding how they may interrogate the suspect,' [citation]. ***

> At the same time, the objective Miranda custody inquiry could reasonably be viewed as different from doctrinal tests that depend on

- 15 -

the actual mindset of a particular suspect, where we do consider a suspect's age and experience. For example, the voluntariness of a statement is often said to depend on whether 'the defendant's will was overborne,' [citation], a question that logically can depend on 'the characteristics of the accused,' [citation]. The characteristics of the accused can include the suspect's age, education, and intelligence, [citation], as well as a suspect's prior experience with law enforcement, [citation]. In concluding that there was 'no principled reason' why such factors should not also apply to the Miranda custody inquiry, [citation], the [Alvarado court] ignored the argument that the custody inquiry states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristics--including his age--could be viewed as creating a subjective inquiry." Yarborough, 541 U.S. at 667-68, 158 L. Ed. 2d at 953-54, 124 S. Ct. at 2151-52.

In Braggs, our supreme court discussed modification of the reasonable-person standard to take into account an individual's status as a juvenile. Such modification was not the

subject of the court's holding; however, the court used that discussion to support its determination that modification of the reasonable-person standard was appropriate to account for the defendant's mental retardation. Alvarado, the case at the heart of Braggs's discussion, was reversed by the United States Supreme Court in Yarborough. There, although the Supreme Court did not hold consideration of a defendant's age during a Miranda custody inquiry was prohibited, it strongly emphasized the objective nature of such an inquiry.

Applying the modified standard defendant suggests, i.e., what a reasonable 16-year-old in defendant's position would have perceived, incorporates a subjective factor into an objective test. Given the Supreme Court's emphasis on objectiveness, we decline to consider defendant's age when determining whether he was in custody for Miranda purposes.

However, we note the trial court did consider defendant's age and other subjective factors at the suppression hearing. At the conclusion of the evidence, the court stated, in part, as follows:

> "[W]e have a young man who is on proba-
> tion, juvenile case. *** So he has had some
> *** familiarity with not only the police
> officers but with the court system itself.
> ***
> The defendant's testimony is such that
> the [c]ourt is of the opinion that *** he

- 17 -

looks and sounds more mature and older than a
[17] year old. ***

***[T]he [c]ourt has to consider his
age, his education, his intellectual level,
prior experiences, [and] his lifestyle.  The
good news is the defendant is[,] *** in this
[c]ourt's opinion[,] an intelligent young
man, somewhat articulate. ***."

Here, considerations of the circumstances surrounding
the interrogation and what a reasonable person in defendant's
position would have perceived do not result in a finding that
defendant was in custody for Miranda purposes during the van
interview.  The record shows the interrogation at issue occurred
over the course of a few hours in the afternoon.  Defendant and
two police officers, Rea and Rein, were present for the inter-
view, which was conducted, for the most part, inside a van that
was parked on a city street.  The evidence showed, while the van
was Rein's work vehicle, it was not a typical police vehicle.
The van was unmarked with no radio.  Further, although the
testimony revealed the van doors locked automatically as the
vehicle was driven, the van had no means by which to secure an
individual inside.  More specifically, it did not have a cage or
lack door handles.

Rea's and defendant's testimonies differed on the
circumstances surrounding defendant's entry into the van.  The
trial court found defendant entered the van of his own accord.

- 18 -

That finding was supported by Rea's testimony and is not against the manifest weight of the evidence. Further, defendant was not handcuffed or searched prior to entering the van and the record fails to reflect any other indicia of formal arrest procedure.

After defendant entered the van, he and Rea began discussing Altravius's death. Rea was dressed in plain clothes and was the officer who primarily questioned defendant. Although Rea admitted his intention was to get defendant to confess to murder, the record does not reflect that the mood of the interrogation was such that reversal of the trial court's decision is warranted. Moreover, the court found the officers drove defendant home at defendant's request and that defendant could have exited the vehicle but, instead, chose to remain and answer more questions. Its finding is supported by Rea's testimony and, while defendant's testimony contradicted Rea's, the court found Rea more credible.

Ultimately, defendant agreed to go to the police department and provide a taped statement. At the end of the interview, defendant was permitted to leave and was not arrested.

Based upon these circumstances, we find that a reasonable person in defendant's position would not have felt he was in police custody during the van interrogation. The trial court did not err by denying defendant's motion to suppress.

For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.

Affirmed.

MYERSCOUGH and TURNER, JJ., concur.