NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210410-U

NO. 4-21-0410

IN THE APPELLATE COURT

FILED
July 15, 2022
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| DWAYNE T. CROOM, | ) | No. 05CF1023 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jason Matthew Bohm, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding that the trial court did not abuse its
discretion in finding defendant permanently incorrigible and resentencing him to
50 years' imprisonment.

¶ 2    Defendant, Dwayne T. Croom, was convicted of first degree murder for the

murder of a three-year-old child in 2004. Defendant was 16 years old at the time of the offense.

The trial court sentenced him to 50 years' imprisonment. In postconviction proceedings,

defendant argued that his 50-year sentence was a *de facto* life sentence and was unconstitutional

pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012). We vacated defendant's sentence and

remanded the matter for a new sentencing hearing, finding that the record of the original

sentencing hearing did not reflect the trial court had determined defendant's conduct showed

permanent incorrigibility. *People v. Croom*, 2020 IL App (4th) 170817-U, ¶ 76. Following a

hearing, the trial court found defendant was permanently incorrigible and resentenced him to 50 years' imprisonment.

¶ 3        Defendant appeals, arguing that the "sentencing court abused its discretion when it ignored the bulk of the uncontradicted mitigation evidence presented by an expert witness, and found [defendant] permanently incorrigible despite the court's own finding that there was hope for [defendant], and where a permanent incorrigibility finding was unsupported by the evidence presented." We affirm.

¶ 4                                  I. BACKGROUND

¶ 5        Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 2004)) for causing the death of three-year-old A.B. in 2004. We described the trial and sentencing proceedings in detail in our prior order in *Croom*, 2020 IL App (4th) 170817-U, and we will summarize them briefly here.

¶ 6                              A. Fitness to Stand Trial

¶ 7        Prior to trial, the trial court ordered a fitness examination. A psychiatrist examined defendant and found him unfit to stand trial due to concerns that he would be unable to assist his attorney. The psychiatrist noted that defendant's counsel found him to be unusually rigid and insolent of any bad news. The psychiatrist found defendant to be "defensive and concrete," noted defendant refused to consider a possible plea agreement, and found that defendant "seemed unable to differentiate between a decision in the criminal justice system and the truth about the crime." The psychiatrist diagnosed defendant with antisocial personality disorder and indicated he wanted defendant to be more extensively evaluated to determine whether he suffered from psychosis.

¶ 8        The trial court found defendant unfit to stand trial. A different psychiatrist subsequently determined defendant possessed antisocial traits but did not meet the criteria for antisocial personality disorder. The psychiatrist also found defendant did not suffer from any other mental illness. The court subsequently found defendant fit to stand trial.

¶ 9                                B. Trial

¶ 10        The matter proceeded to a jury trial. The evidence showed that defendant was 16 years old at the time of the offense. He was residing with his 21-year-old girlfriend, Rochelle B., who had an intellectual disability. Rochelle's two children, A.B. and his two-year-old sister, lived with them as well. Shortly after 11 p.m. on the night of the incident, Rochelle called 911 and reported that A.B. was not breathing. Paramedics arrived at the home a few minutes later and found that A.B. was very cold to the touch and lacked any vital signs. A.B. was later pronounced dead. The State presented medical evidence that A.B. had been physically abused and had died hours before arriving at the hospital due to blunt force trauma to the abdomen. The doctor who performed A.B.'s autopsy testified the injuries he observed on A.B.'s body, which were in various states of healing, indicated that A.B. had been subject to a "pattern of injury" over time.

¶ 11        On the night of the incident, defendant told a police officer he woke up at 11 p.m. because A.B. had wet the bed. Defendant put A.B. in the bathtub to wash him in cold water. A.B. had a seizure, which caused him to fall and hit his head in the bathtub. Defendant said A.B. had a history of seizures associated with sickle cell anemia. That same night, defendant told another officer he woke up to Rochelle beating A.B. Defendant said he then bathed A.B. and A.B. had a seizure.

¶ 12        Approximately one month later, a police officer confronted defendant with medical evidence that contradicted defendant's versions of the events. The officer testified that

defendant stated during the interview: "I can't do this[.] I did this." Defendant also stated that A.B. had fallen from playground equipment on the day of his death. Later that day, in a recorded interview, defendant denied that he had hurt A.B. and maintained that Rochelle beat A.B. on the night of his death. Defendant admitted, however, that some of the things he said in his initial interview were not true. He maintained that A.B. had fallen from playground equipment earlier in the day.

¶ 13 A doctor who treated A.B. at the hospital testified the injuries that caused A.B.'s death could not have been caused by a fall from playground equipment and that seizures were not associated with the condition of sickle cell anemia.

¶ 14 Rochelle testified that defendant physically abused her and her children. On the night of A.B.'s death, Rochelle woke up at approximately 11 p.m. Defendant had A.B. in the bathtub, and A.B. was not breathing. Rochelle testified she did not hit A.B. that night, though she previously told a police officer she did. She stated defendant and his mother forced her to go to the police station and say that she did, and she later recanted it.

¶ 15 Defendant testified at trial that he lied about A.B. falling from the playground equipment. He stated that he woke up around 11 p.m. on the night of the incident and heard Rochelle beating A.B. He then gave A.B. a bath, and A.B. "blacked out," fell, and hit his head. Defendant was unsure whether A.B. had a seizure.

¶ 16 The jury found defendant guilty of first degree murder.

¶ 17    C. Sentencing Hearing

¶ 18 A presentence investigation report (PSI) was prepared prior to defendant's sentencing. The PSI indicated defendant had prior adjudications of juvenile delinquency for the offenses of unlawful possession of alcohol and retail theft. Defendant reported having a good

relationship with his mother and that his father was incarcerated. The PSI stated defendant "did not appear to be truthful" in his interview with the probation officer who prepared the report. Defendant reported never having involvement with the Department of Children and Family Services (DCFS), using alcohol, or using drugs. However, this was inconsistent with information contained in other court records.

¶ 19 Three police officers testified at defendant's sentencing hearing concerning an incident that occurred prior to A.B.'s death and another incident that occurred after his death. Their testimony indicated that less than two months before A.B.'s death, officers executed a search warrant at an apartment in Kankakee where Rochelle lived. They located 15 individual baggies of crack cocaine and two handguns in a bathroom. Rochelle told the officers the items belonged to defendant. Several months after A.B.'s death, officers called a telephone number that they suspected was associated with the sale of drugs. They set up a meeting with the individual who answered their call. Defendant subsequently appeared at the arranged meeting place. The officers searched him and found suspected cannabis. Defendant admitted that he sold small amounts of cannabis.

¶ 20 The trial court sentenced defendant to 50 years' imprisonment. The court found that defendant was intelligent, articulate, and had "a lot of potential." It found that defendant's age at the time of the offense was the only applicable mitigating factor.

¶ 21 D. Direct Appeal and Postconviction Proceedings

¶ 22 On direct appeal, we affirmed defendant's conviction and sentence. *People v. Croom*, 379 Ill. App. 3d 341, 352 (2008). In 2008, defendant filed a *pro se* postconviction petition, which the trial court summarily dismissed. On appeal, we affirmed the summary dismissal. *People v. Croom*, No. 4-09-0047 (2010) (unpublished order under Illinois Supreme

Court Rule 23). In 2010, defendant, *pro se*, filed a motion for leave to file a successive postconviction petition, which the trial court denied. We affirmed the trial court's denial of the motion. *People v. Croom*, 2012 IL App (4th) 100932, ¶ 31.

¶ 23　　　　　In 2017, defendant filed a second *pro se* motion for leave to file a successive postconviction petition. The motion alleged that, pursuant to *Miller*, 567 U.S. 460, defendant's 50-year sentence was a *de facto* life sentence and was unconstitutional because he was only 16 years old at the time of the offense, and the trial court failed to consider his youth and its attendant characteristics when imposing the sentence. The court denied the motion. On appeal, we reversed the judgment of the trial court, holding that the court imposed a *de facto* life sentence and the record did not reflect that it had determined " 'defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.' " *Croom*, 2020 IL App (4th) 170817-U, ¶ 72 (quoting *People v. Holman*, 2017 IL 120655, ¶ 46). We found that the record was sufficient to consider defendant's *Miller* claim such that further factual development was unnecessary. *Id.* ¶ 76. We vacated defendant's sentence and remanded the matter for a new sentencing hearing. *Id.*

¶ 24　　　　　　　　　　　　D. Resentencing Hearing

¶ 25　　　　　On remand, a new PSI was prepared prior to the resentencing hearing. The PSI noted defendant's prior adjudications of juvenile delinquency and stated defendant denied any gang affiliation. The PSI indicated defendant's father was in prison and that defendant reported having a close relationship with his mother. Defendant stated he was placed in foster care as an infant and remained there for a couple of years. Defendant reported that he had previously been diagnosed with schizoaffective disorder, bipolar disorder, and "impulse control." Defendant stated he began drinking alcohol when he was 10 or 11 years old and would drink it at least five

days per week. He began smoking cannabis when he was nine years old. He used alcohol and cannabis until he went to prison. He also experimented with ecstasy at the age of 15 or 16.

¶ 26     On May 21, 2021, a new sentencing hearing was held before a new judge. The State requested that the trial court take judicial notice of the findings, reports, and orders in Champaign County case No. 94-J-4. The State also asked that the court take judicial notice of three fitness reports filed in 2005 and 2006, the transcripts of prior proceedings in the case, evidence introduced at the trial, and records from the Illinois Department of Corrections (DOC). The court took judicial notice of the documents and indicated it had reviewed them.

¶ 27     The records from Champaign County case No. 94-J-4 showed that when defendant was six years old, he was removed from the custody of his mother, Dezette Croom, and placed in foster care. He expressed sadness at times over the prolonged and unexplained absence of his mother. The records indicated defendant's father was in prison during that time. Initially, Dezette was completely absent from her children's lives. She eventually began having regular visitation with her children, and defendant was returned to her custody approximately two years after he was placed in foster care.

¶ 28     The DOC records indicated defendant had been disciplined for various infractions between March 2010 and October 2019. Defendant had multiple infractions related to the possession of drugs and contraband. Defendant also had infractions for fighting in 2010, assaulting an inmate in 2015, violent assault of an inmate in 2017, and violent assault of staff in 2018. The records indicated that during the 2018 incident, defendant threatened three correctional officers with a sharpened homemade weapon. He reportedly said: "I have 50 years to do and nothing to lose, who wants to go first?" Defendant refused to drop the weapon and

barricaded himself in an office. Defendant repeatedly swung the weapon at the officers and bit one of them during the incident.

¶ 29　　　　The State called Mary Smith as a witness. Smith testified that she had been a foster parent for approximately 30 years. She estimated she had fostered 25 children during that time. She had adopted 11 children. Smith testified defendant was in her care in 1994. He was "good" and played with the other children. He sometimes cried a lot because he wanted his mother. The prosecutor asked Smith about defendant's assertions that, when he wet the bed, Smith would put him in a closet in his wet clothes for hours, have him take a bath, and beat him with an extension cord when he was finished. Smith stated that this was untrue. She said no allegation of abuse ever came up when defendant was in her care.

¶ 30　　　　Defendant called Dr. James Garbarino as a witness. The court indicated it had reviewed Dr. Garbarino's written report, which defendant had previously submitted. The court accepted Dr. Garbarino as an expert witness in the field of developmental psychology.

¶ 31　　　　Dr. Garbarino testified that, in his work, he "served as an analysis [*sic*] rather than an investigator," so the information he considered was typically gathered by others. Dr. Garbarino did not personally interview defendant but rather reviewed records of interviews defendant had with his attorney. Dr. Garbarino did not read the transcript of defendant's trial testimony. He reviewed "summaries of *** the crime reports," but he did not usually focus on the facts of the offense. Dr. Garbarino stated that, to his knowledge, no research showed that the severity of a teenager's violent behavior predicted "much of anything about their future." He indicated that while the facts of the offense may be "legally significant" and "morally significant," they "may be developmentally of very limited significance whatsoever." He stated

that the severity of the offense was not necessarily indicative of an individual's ability to be rehabilitated.

¶ 32       Dr. Garbarino asked defendant to complete a 10-item adverse childhood experiences (ACE) questionnaire. Dr. Garbarino indicated adverse childhood experiences were highly predictive of difficulties later in life and violent behavior. Dr. Garbarino also sent defendant a series of life-history questions, and defendant provided written responses.

¶ 33       Dr. Garbarino stated that, in this country, two-thirds of respondents scored 0 or 1 on the ACE scale, 1 in 100 scored 7 or higher, and 1 in 1000 scored 8 or higher. Defendant answered "yes" to 9 items, which placed him in "the worst one-tenth of a percent." According to Dr. Garbarino, this score would be considered very unusual in the general population, but it is not unusual for young people who have committed murder. Defendant reported that, during his childhood, he experienced verbal abuse, physical abuse, sexual abuse, emotional neglect, physical neglect, parental separation, witnessing domestic violence, living with a substance abuser, and having a family member in prison. Dr. Garbarino acknowledged that because the responses to the ACE questions came directly from defendant, there was a "possibility for manipulation" in the answers.

¶ 34       Dr. Garbarino opined that the rare child offenders who could not be rehabilitated fell into two categories: psychopaths and individuals who were chronically and severely abused during the first three years of life. Dr. Garbarino encountered offenders who fit into one of these categories in approximately five percent of the cases he had worked on. Based on Dr. Garbarino's review of "everything in this case," he did not find defendant fit into either of these categories.

¶ 35    Dr. Garbarino's written report stated that defendant was exposed to a high level of community violence. Defendant reported that his father was abusive toward him and Dezette. He grew up around gang members, was affiliated with a street gang by the age of 12, and began carrying a gun for protection when he was 12 or 13 years old. The report stated that defendant experienced chronic trauma during his childhood and adolescence "as he witnessed acts of violence in his family and in the community." The report noted that defendant was functioning in a parental capacity at the time of A.B.'s death despite being only 16 years old. Accordingly, defendant "was operating under the influence of the parenting norms and role models with which he had experience growing up." Defendant reported that he had been beaten by family members as a child as a form of discipline. Dr. Garbarino stated: "It seems clear that these were corrupting influences on his conception of parenting—with terrible consequences in the case of [A.B.]."

¶ 36    Dr. Garbarino's report stated that defendant reported his foster mother was "highly toxic." Defendant reported that he wet the bed when he was in foster care, and his foster mother would lock him in a closet in his wet clothes for hours. She would then "trick [him] to go take a bath," and would beat him with an extension cord after he was finished bathing. Defendant also reported that he was sexually abused by his foster mother's daughter.

¶ 37    According to the report, defendant indicated his mother left him and his three siblings to fend for themselves for a period of time when he was approximately 13 years old.

¶ 38    Dr. Garbarino opined:

> "[Defendant's] childhood and adolescent experience of maltreatment in the
> context of a socially toxic environment encompasses multiple, significant
> mitigating factors that should be considered in sentencing decisions in his case.
> His history produced damage to his ability to behave reliably in a pro-social

manner as an adolescent. But these are not immutable characteristics of how [defendant] relates to the world."

Dr. Garbarino stated that "[w]hatever the specific actions [defendant] may have committed" at the time of the offense, "it does not necessarily indicate an immutable and deeply ingrained habit of violent anti-social thinking, feeling, and behavior." Instead, "it is the kind of behavior one might expect from an 'untreated, traumatized child inhabiting and controlling the body of a teenager,' rather than a 'monster.' " Dr. Garbarino concluded: "There is hope for [defendant]; he is not a lost cause."

¶ 39    Dezette testified that defendant was in foster care for approximately one year when he was six or seven years old. While defendant was in foster care, Dezette went to a rehabilitation facility, obtained employment, and got an apartment. Defendant's father was in and out of prison during defendant's childhood. Dezette sometimes disciplined defendant by spanking him. Defendant's father gave defendant "whuppings," which were more severe than spankings. When defendant was 11 or 12, Dezette and her children moved to Ohio. While they lived in Ohio, Dezette occasionally left her children alone for days or weeks at a time.

¶ 40    Dezette stated defendant had changed since the time of the offense in that he was "grown" and was a man rather than a child. Dezette could tell how defendant had changed by the way he talked about his life.

¶ 41    A victim impact statement prepared by A.B.'s sister was read in court. In her statement, A.B.'s sister requested the trial court resentence defendant to 50 years in prison.

¶ 42    Defendant made a statement in allocution in which he thanked the court for giving him the "opportunity to speak [his] truth." Defendant stated he was guilty of failing to defend a child who could not defend himself. He stated: "Being incarcerated as a boy among men that

- 11 -

have been deemed as beyond the possibility of rehabilitation molds into a man with nothing to lose." Defendant said that if the court gave him the opportunity for a "second chance at life," he would not squander it.

¶ 43　　　　The trial court prefaced its remarks by noting it had considered the PSI, the evidence presented by the parties, the arguments of counsel, the victim impact statement, defendant's statement in allocution, and the statutory factors in mitigation and aggravation. The court stated it had also "substantially considered" the factors found in section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2020)), which applied when a defendant was under 18 at the time of the offense. The court stated:

> "These considerations obviously require me to consider [defendant's] youth at the time of the offense, as well as weighing the nature and circumstances of the offense, the history and characteristics of the defendant, which includes rehabilitation potential. It also requires consideration of the sentence to reflect just punishment, protection of the public, and promotion of the ends of justice."

¶ 44　　　　The trial court stated that Dr. Garbarino had written at the end of his report that there was hope for defendant. The court stated: "I think that's right. But that hope is not what some judge, in some courtroom, or some group of appellate judges say. That hope lies in what [defendant] becomes inside himself regardless of whether he's in a prison."

¶ 45　　　　The trial court noted defendant's statement that he was thankful he got to "speak his truth." The court stated: "Well, [defendant], your truth is a lie." The court observed that defendant beat A.B. to death and that it was not done in a "singular moment of passion" or "isolated fit of rage." Rather, A.B.'s injuries indicated he had been beaten many times before. The court stated that, on the night of A.B.'s death, defendant beat A.B. and then allowed A.B.

"to lay there and die." The court noted that A.B.'s body was cold to the touch once defendant finally called the authorities. The court found that the "depravity and callous indifference evidenced by the brutality of [A.B.'s] killing [was] breathtaking." The court stated that if defendant had been an adult at the time of the offense, "a life sentence would be the only reasonable one."

¶ 46    The trial court noted, however, that the United States Supreme Court had recognized in *Miller* that minors were constitutionally different from adults for the purposes of sentencing, as juveniles lacked maturity, had an underdeveloped sense of responsibility, were more vulnerable to negative influences and outside pressures, had limited control over their own environment, and had characters that were less well-formed than adults. The trial court stated that, in its opinion, "part of what it means to be a human being is the capacity for change. That includes change for the better, and change for the worse." The court noted that it was impossible to predict how a teenager who had committed murder would change during decades of institutionalization. The court stated:

> "And what has [defendant] shown in terms of deciding whether he was transiently immature when, at 16, he savaged [A.B.]?
>
> The truth is, [defendant], I can find no evidence that whatever was in you in 2005 [*sic*] that made you beat this child was transient. Transient means it goes away. If something goes away it isn't permanent, and one would expect it not to be present. But if we look at more recent history, what do we find? 2017, there's an assault on an inmate that you were involved in ***.
>
> But if you want to convince a judge that you were transiently immature and not irreparably corrupt, you need to become something closer to a model

- 13 -

inmate than what you are. You've had 15 years to do that, you've failed to do that. In 2018, even more recently, you were found with a shank. And then rather than obey the commands to drop the weapon, what do you do? You point the weapon at the guards and say, quote, 'I have 50 years to do, nothing to lose, who wants to go first?' This violence, this inclination towards killing, it's not transient ***, it appears to be permanent. And it isn't evidence that your mother thinks that you have changed. Nearly every mother on this planet thinks their children have improved for the better.

And there's no evidence offered by Dr. [Garbarino] about your personal rehabilitation. He's never met you. Dr. [Garbarino] is an expert on development, and I think he offered good insight into how young men develop; but he offered to [*sic*] basis to conclude that you have developed positively. Instead, frankly what came out in his report is the old adage, garbage in, garbage out. You gave him garbage to put in that report, like the lies you told about Mary, your foster mother. On page nine of Dr. [Garbarino's] report you were quoted as saying that she beat you with extension cords, locked you had in a closet with your urine-soaked clothes. I do not believe for one second that this woman, who has adopted 11 children, whose heart bleeds for kids like you were, that she did anything of the sort. Instead this lie you are telling about her shows that your lying isn't transient, it's permanent. You lie. You manipulate. You concoct stories."

The court stated that defendant was a "manipulator" when he "concocted lies about [A.B.'s] murder," and the court believed defendant "remain[ed] a manipulator."

¶ 47    The trial court stated: "It is the judgment of this court that you have not moved forward, but that you have remained permanently incorrigible. Even if I don't have to make that finding after [*Jones v. Mississippi*, 593 U.S. ___, 141 S. Ct. 1307 (2021)], I am making it."

¶ 48    The trial court ultimately resentenced defendant to 50 years' imprisonment. This appeal followed.

¶ 49                    II. ANALYSIS

¶ 50    On appeal, defendant argues that the trial court abused its discretion in resentencing him to 50 years' imprisonment "when it ignored the bulk of the uncontradicted mitigation evidence presented by an expert witness, and found [defendant] permanently incorrigible despite the court's own finding that there was hope for [defendant], and where a permanent incorrigibility finding was unsupported by the evidence presented." We find that the court did not abuse its discretion by finding defendant permanently incorrigible and resentencing him to 50 years' imprisonment.

¶ 51    "It is well settled that the trial court has broad discretionary powers in imposing a sentence [citation], and the trial court's sentencing decision is entitled to great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). "[A]bsent an abuse of discretion by the trial court, the sentence may not be altered on review." *Id.* at 209-10. "[A] sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 52    Sentencing courts are required to consider the statutory factors in aggravation and mitigation set forth in sections 5-5-3.1 and 5-5-3.2(a) of the Code (730 ILCS 5/5-5-3.1, 5-5-3.2(a) (West 2020)). While a sentencing court must set forth its reasons for the sentence

imposed, the court is not required "to recite, and assign a value to, each fact presented in evidence at the sentencing hearing." *People v. Meeks*, 81 Ill. 2d 524, 534 (1980).

¶ 53    Additional sentencing considerations apply when the defendant was a juvenile at the time of the offense. In *Miller*, the United States Supreme Court held "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The *Miller* Court stated that mandatory life sentences for juveniles precluded sentencing courts from considering a juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477. The Court noted that such a scheme also prevents sentencing courts from considering a juvenile's family and home environment, the degree of the juvenile's participation in the offense, the ways in which the juvenile may have been affected by familial and peer pressure, and the fact that the juvenile might have been charged and convicted for a lesser offense "if not for incompetencies associated with youth," like an inability to deal with prosecutors in negotiating a plea agreement or to assist his own attorney. *Id.* at 477-78.

¶ 54    In *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016) (quoting *Miller*, 567 U.S. at 480), the Supreme Court explained that "*Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' " The *Montgomery* Court stated that *Miller* "bar[red] life without parole *** for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at 209. The *Montgomery* Court explained that "*Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Id.*

¶ 55 Following *Miller* and *Montgomery*, the Illinois Supreme Court held that the holding and rationale of *Miller* applied to juveniles who were sentenced to a mandatory *de facto* life sentence—that is, a term of years that was the functional equivalent of life imprisonment. *People v. Reyes*, 2016 IL 119271, ¶ 9. The court later held that a *de facto* life sentence for a juvenile is a sentence greater than 40 years' imprisonment. *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42. The court also held that *Miller* applied to discretionary natural and *de facto* life sentences for juveniles. *People v. Holman*, 2017 IL 120655, ¶ 40; *Buffer*, 2019 IL 122327, ¶ 27. The court held that, in such situations, a trial court may not impose a life sentence without considering youth and its attendant characteristics. *Buffer*, 2019 IL 122327, ¶ 27.

¶ 56 In *Holman*, 2017 IL 120655, ¶ 46, the court discussed the application of the *Miller* factors. The *Holman* court stated:

"Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police

- 17 -

officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* ¶ 46. The *Holman* court also noted that "consideration of the *Miller* factors is consistent with section 5-4.5-105 of the Unified Code of Corrections." *Id.* ¶ 45. Section 5-4.5-105(a) of the Code (730 ILCS 5/5-4.5-105(a) (West 2020)) provides that, when a person under the age of 18 commits an offense, the trial court shall consider nine specified mitigating factors in sentencing the defendant. These nine factors include the ones discussed in *Holman*, 2017 IL 120655, ¶ 46. See 730 ILCS 5/5-4.5-105(a) (West 2020).

¶ 57        The United States Supreme Court subsequently held in *Jones*, 593 U.S. at ___, 141 S. Ct. at 1318-19, that trial courts are not required under the eighth amendment to make a separate factual finding of permanent incorrigibility before imposing a sentence of life without parole on a juvenile. The Illinois Supreme Court recently found *Holman*'s holding that *Miller* applies to discretionary life sentences was "questionable" in light of *Jones*. *People v. Dorsey*, 2021 IL 123010, ¶ 41.

¶ 58        In the instant case, defendant argues *Holman* has not been overruled by the Illinois Supreme Court and remains good law. Defendant also argues the reasoning of *Holman* should continue to apply to discretionary life sentences under the proportionate penalties clause of our state constitution. The State notes the holding in *Jones* but does not argue that it controls the outcome of this case. Rather, the State contends the trial court's sentence of 50 years' imprisonment was not an abuse of discretion because the court properly found defendant's conduct was the product of permanent incorrigibility.

¶ 59        We need not determine whether *Jones* precludes defendant's argument on appeal or whether the reasoning in *Holman* continues to apply under the proportionate penalties clause.

Even assuming, *arguendo*, the trial court was required to make a finding of "irretrievable depravity, permanent incorrigibility, or irreparable corruption" before imposing a discretionary, *de facto* life sentence, we find the trial court did not abuse its discretion in finding that defendant was permanently incorrigible and resentencing him to 50 years' imprisonment. The court indicated that it had considered, *inter alia*, the PSI, evidence presented by the parties, defendant's statement in allocution, and the statutory factors in aggravation and mitigation. The court also indicated it had "substantially considered" the factors from section 5-4.5-105 of the Code (730 ILCS 5/5-4.5-105 (West 2020)), which is essentially a codification of the *Miller* factors.

¶ 60       In finding that defendant was permanently incorrigible, the trial court found that defendant did not kill A.B. in a "singular moment of passion" or an "isolated fit of rage," but rather that the fatal beating had followed many other beatings. The court found that the "depravity and callous indifference evidenced by the brutality of [A.B.'s] killing [was] breathtaking." The court further noted that defendant was involved in violent incidents in prison in 2017 and 2018. The court found that defendant's violence and inclination toward killing was not transient but rather "appear[ed] to be permanent." The court also found that defendant's tendency to lie and manipulate was permanent rather than transient. The court found that defendant had "concocted lies" about A.B.'s murder at the time of the incident, had not accepted responsibility for his actions, and lied to Dr. Garbarino about being abused by his foster mother.

¶ 61       We reject defendant's argument that the trial court erred in basing its finding of permanent incorrigibility, in part, on his conduct in prison. Defendant cites *Holman*, 2017 IL 120655, in support of this proposition. In *Holman*, the defendant argued in postconviction proceedings that his discretionary life sentence was unconstitutional under *Miller*. *Id.* ¶ 20. The

*Holman* court stated that because the defendant was sentenced before the mitigating factors from section 5-4.5-105 of the Code went into effect, "any inquiry into the Miller factors [was] backwards-looking." *Id.* ¶ 47. The court stated:

> "Bad conduct while imprisoned cannot buttress a finding of incorrigibility. Similarly, good conduct while imprisoned cannot undercut such a finding. In revisiting a juvenile defendant's life without parole sentence, the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id.* ¶ 47.

The *Holman* court reviewed the evidence introduced at the defendant's sentencing hearing and noted that the trial court had found the defendant's conduct placed him beyond rehabilitation. *Id.* ¶¶ 48-50. The *Holman* court concluded the defendant's sentence "passe[d] constitutional muster under *Miller*." *Id.* ¶ 50.

¶ 62        In the instant case, unlike in *Holman*, this court previously found the record from the original sentencing hearing did not show that the trial court had determined defendant was permanently incorrigible. See *Croom*, 2020 IL App (4th) 170817-U, ¶ 76. Accordingly, we vacated defendant's sentence and remanded the matter for a new sentencing hearing. *Id.* Section 5-5-3(d) of the Code (730 ILCS 5/5-5-3(d) (West 2020)) provides that when a sentence originally imposed is vacated and the matter is remanded for resentencing, the trial court may consider "evidence of the defendant's life, moral character and occupation during the time since the original sentence was passed." *Holman* did not consider the applicability of section 5-5-3(d)

in a resentencing hearing, as the *Holman* court merely reviewed the cold record to determine if the original sentencing hearing complied with *Miller*. As such, *Holman* does not provide a basis for us to depart from the general statutory principle that, at a resentencing hearing, the trial court may consider evidence of the defendant's life and moral character for the period following his original sentencing. See 730 ILCS 5/5-5-3(d) (West 2020).

¶ 63 Defendant also argues that his disciplinary record in prison was not evidence that he could not be rehabilitated because his *de facto* life sentence caused him to lose hope and gave him little incentive to become a responsible person. See *Graham v. Florida*, 560 U.S. 48, 70 (2010) (quoting *Naovarath v. State*, 779 P.2d 944 (Nev. 1989)) ("[A] sentence [of life without parole] 'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.' "). While that is one potential explanation for why a prisoner serving a life sentence might behave violently, the trial court could also reasonably conclude that defendant's violent behavior in prison was evidence that he lacked rehabilitative potential.

¶ 64 We also reject defendant's argument that the trial court "abused its discretion when it discounted most of the uncontradicted evidence presented by Dr. Garbarino because it found part of the evidence was not credible." Defendant contends the court found that defendant lied about being abused by his foster mother and then discounted all the other information in Dr. Garbarino's report even though some of it was corroborated by other evidence in the record. Specifically, defendant notes that the record corroborates that defendant was taken into foster care after his mother left him with relatives, his mother abandoned him and his siblings again

when he was 11 or 12 years old, his father was incarcerated, and he suffered physical abuse as a child in the form of "whuppings" from his father.

¶ 65 However, the record does not reflect that the court failed to consider information concerning defendant's childhood that was independently corroborated in other parts of the record. "Where mitigating evidence is presented to the trial court, it is presumed, absent some indication to the contrary, other than the sentence itself, that the court considered it." *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. The court indicated it had considered the sources that independently corroborated some of defendant's statements contained in Dr. Garbarino's report, including the evidence presented at the resentencing hearing and the PSI. The court did not state that defendant had not had any adverse childhood experiences, that such experiences were not mitigating, or that all the information defendant told Dr. Garbarino was false. Rather, the court indicated that it did not accept Dr. Garbarino's conclusions concerning defendant's rehabilitative potential because Dr. Garbarino had never met defendant and had based his report on defendant's own statements, at least some of which the court found to be untrue. The court also found that defendant had "concocted lies" about the murder at the time of the offense and continued to lie about his role in it. The trial court's assessment of Dr. Garbarino's report and defendant's credibility is entitled to substantial deference by this court. We do not find its conclusion was an abuse of discretion.

¶ 66 We also reject defendant's argument that the trial court's finding that defendant was permanently incorrigible "was contrary to the court's finding that there was hope for [defendant]." Defendant points to two passages in the trial court's remarks at resentencing and contends that the court's finding that there was hope for defendant meant that defendant was not beyond rehabilitation and had some capacity for change. In the first passage, the trial court

highlighted the portion of Dr. Garbarino's report mentioning he had hope for defendant, after which the court stated: "I think that's right. But that hope is not what some judge, in some courtroom, or some group of appellate judges say. That hope lies in what [defendant] becomes inside himself regardless of whether he's in a prison." In the second passage, the trial court stated: "At the beginning I said there is hope for you. That hope depends on what you do inside of yourself." From this, defendant argues the trial court "found there was hope for his future rehabilitation." We disagree with defendant's conclusion. In fact, it is difficult to discern exactly the gist of the quoted comments. However, in light of the court's very clear statements that it considered defendant to be permanently incorrigible and that his violence and "inclination toward killing" was not transient, we find it would be unreasonable to interpret these vague comments relating to "hope" as expressions of a contrary view.

¶ 67                                    III. CONCLUSION

¶ 68            For the reasons stated, we affirm the trial court's judgment.

¶ 69            Affirmed.